**FOR PUBLICATION**

FILED

Jul 17 2013, 5:48 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BRIAN R. GATES**
**TIMOTHY W. WOODS**
Jones Obenchain, LLP
South Bend, Indiana

ATTORNEY FOR APPELLEE:

**ROBERT J. PALMER**
May, Oberfell, Lorber
Mishawaka, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TIMOTHY S. ENDERS and ENDERS & LONGWAY BUILDERS, INC., | ) | |
| | ) | |
| Appellants-Respondents, | ) | |
| | ) | |
| vs. | ) | No. 71A03-1211-PL-494 |
| | ) | |
| DEBRA SUE ENDERS as Personal Representative of the Estate of Randall Enders, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ST. JOSEPH CIRCUIT COURT
The Honorable Michael G. Gotsch, Judge
Cause No. 71C01-1208-PL-188

**July 17, 2013**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

While the old adage "blood is thicker than water" may be true for many, unfortunately some people have their most bitter and enduring disputes with family members which may persist even beyond death. In this case, Randall and Timothy Enders inherited equal shares in Enders & Longway Builders, Inc. (the "Company"), the business that their father had started. Randall and Timothy signed a Buy-Sell Agreement, which strictly limited their ability to transfer their shares of the Company and provided that upon the death of one brother, his shares passed automatically to the surviving brother, unless, among other occurrences, the corporation was dissolved.

Because of a disability, Timothy stopped actively working for the Company, but still had some of his expenses, such as his utilities, paid by the Company. Randall continued running the business and sharing the profits with his brother, until Randall became terminally ill sometime around the spring or early summer of 2012. Randall approached Timothy about dissolving the corporation because it was no longer profitable, insofar as the profits were strictly generated from the Company's assets rather than from any work projects. Timothy was unsympathetic, accusing his brother of simply needing to get out of bed.

Randall filed a petition for a judicial dissolution of the corporation, alleging that the directors and shareholders were deadlocked in the management of corporate affairs. The trial court granted the dissolution effective the date of the hearing; however,

sometime during the weeks between the hearing and when the trial court issued its order dissolving the corporation, Randall[1] passed away.

Timothy[2] now appeals arguing that upon Randall's passing, he became the sole owner of the Company's shares under the Buy-Sell Agreement. We disagree. Randall was alive on the effective date of the trial court's order dissolving the corporation; consequently, Timothy did not become the sole owner of the Company's shares. Accordingly, we affirm.

## FACTS

The Company is a general contracting firm that Timothy and Randall's father started in 1981. Their father was the supervisor and worked with Timothy, who was a bricklayer and a carpenter, and Randall, who was a carpenter. After their father died in 1987, Randall and Timothy inherited the Company with each owning 500 shares of stock or fifty percent of the Company.

On June 24, 1988, Randall and Timothy entered into a Buy-Sell Agreement.[3] On March 13, 1991, Randall and Timothy executed a First Amendment to the Buy-Sell Agreement (the "Agreement"). The Agreement provided that "no Stockholder shall . . .

---

[1] Debra Sue Enders as Personal Representative of the Estate of Randall Enders replaced Randall as the party of interest on April 4, 2013. We will refer to the Appellee-Petitioner as the Estate when speaking of it in the present. Otherwise, we will refer to the Appellee as Randall when describing events before his passing.

[2] Although Timothy Enders and Enders & Longway Builders, Inc. are the Appellants-Respondents, we will simply refer to Timothy.

[3] Neither party has provided this Court with a copy of the first agreement.

3

in any manner encumber or otherwise dispose of the whole or any part of any interest of any kind in the whole or any part of the shares . . . or the certificates." Appellee's App. p. 8. Additionally, the Agreement stated that all stocks in the Company "will be jointly held" and that upon the death of a stockholder, any shares of stock not jointly held "shall be sold and purchased by the remaining Stockholder for ONE AND NO/100 ($1.00) DOLLAR per share." Id. The Agreement also provided that before a stockholder could transfer any shares during his lifetime, he had to first offer them to the Company or the other stockholder "at a price of ONE AND NO/100 ($1.00) DOLLAR per share." Id.

The duration of the Agreement was also explicitly described. More particularly, the Agreement would terminate upon:

(A) Cessation of the Corporation's business.

(B) Bankruptcy, receivership or dissolution of the Corporation.

(C) Written agreement of the parties hereto or the remaining parties hereto.

(D) The death of all Stockholders within a thirty (30) day period.

(E) By sale of all of the stock covered by this Agreement to third parties.

Appellee's App. p. 10.

In 2004, Timothy became disabled, and the business began to wind down as Timothy ended his active participation in the Company. Timothy could have remained active in the Company, but it would have required him to bring in a manager, and he was unsure how Randall would react to a manager.

Despite Timothy's decision to not be involved, he was critical of the way in which his brother ran the Company. More particularly, Timothy commented that the business would be more successful if Randall would "get out of the bed and go to work." Tr. p. 86. Randall was in bed because he had been diagnosed with terminal cancer in 2012. However, this was not Timothy's only complaint. He thought that Randall should have been hiring people and subcontractors and actively looking for projects for the Company during the busiest time of the year rather than working on home projects.

Because of Randall's deteriorating health, the business had been winding down, and Randall had incurred significant medical bills; he tried to speak to Timothy about dissolving the Company's corporate structure. The brothers, however, disagreed over the distribution of assets, including the certificates of deposit owed by the corporation, but over which Timothy had exclusive control.

On August 21, 2012, Randall filed a petition for judicial dissolution of the corporation. The petition alleged that Timothy had not been involved with the management of the Company in over a year and that Randall wanted to wrap up the affairs of the Company and dissolve it but Timothy would not agree. The petition also alleged that the shareholders were deadlocked in the management of the corporate affairs. The petition requested that the trial court enter an order dissolving the corporation and directing the shareholders to wind up and liquidate its business and affairs or to appoint a receiver to windup and liquidate the business and affairs.

5

The trial court set the matter for a hearing on September 20, 2012. On September 11, 2012, Timothy filed a motion to continue the hearing to October 11, 2012. Randall filed an objection to the motion for a continuance on September 13, 2012, based on the urgency of the situation, namely Randall's deteriorating health. Despite Randall's objections, the hearing was rescheduled for October 11, 2012.

At the October 11 hearing, Mark McNamee, a CPA who had acted as the brothers' individual accountant and the Company's accountant for the past ten to fifteen years testified. McNamee received the corporation's check register and bank statements and reconciled and prepared financial statements. When the business began to wind down in 2004, McNamee started doing financial statements on a quarterly basis. McNamee prepared and filed the Company's tax returns and, when appropriate, prepared W-2 forms. Over the past seven years or more, all of the Company's income had been absorbed through expenses, and there was never any money to pay a wage.

Because of his position, McNamee was familiar with how the Company was managed. During the past two years, Randall had done everything for the Company, including writing checks, delivering books to McNamee, reconciling statements, paying insurance premiums, caring for the facility's landscaping, and generating the Company's income. To McNamee's knowledge, Timothy had not performed any services for the Company since 2004. Likewise, McNamee was unaware of any capital contribution that Timothy had made to the Company during the time that McNamee had served as accountant.

McNamee had been advising Randall and Timothy to dissolve the corporation for several years because the corporation was a "one-man show," and there was no legitimate reason to keep the complexity of the corporation, together with the related expenses, open. Tr. p. 22. Randall could have just as easily been a sole proprietor. Timothy disagreed with the recommendation because of the tax consequences of dissolution.

Randall and Timothy disputed over whether the corporation should be dissolved. That disagreement created a deadlock in the corporate management. From McNamee's experience as an accountant and from an accountant's perspective, the business affairs of the corporation could not be conducted to the advantage of the shareholders and directors with the deadlock that existed. Specifically, McNamee opined that it was the "assets of the Corporation [such as] interest income that generates the revenue to pay [expenses]." Tr. p. 28. McNamee further observed that "because only 50 percent of that entity has been working, the other 50 percent has been deducting those items for business purposes that are questionable." Id. These questionable expenses included Timothy's gas and trash bill. Put another way, the Company was not sustaining itself with its operations, but rather with its existing assets such as certificates of deposit totaling $330,000 and forty acres of land in Niles with access to the St. Joe River.

Despite a financial statement ending on June 30, 2012, that indicated gross profits during the preceding three months and nine months, McNamee explained that the Company would continue to make money off of its assets rather than from "labor, and doing remodeling jobs[.]" Tr. p. 36. Indeed, even when directed to the fact that the

financial statements reflected a time when Randall still had the ability to perform labor for the company did not change McNamee's opinion of the Company's solvency – "The bottom line is, if this Company did not have those CDs, it would not be able to exist." Id. at 41.

McNamee reiterated with more detail: "Randy was far better off being a sole proprietor, so when he billed those clients he got to keep whatever was left over instead of having to share it with his brother, which he did willingly for years. This is not rocket scientist [sic] here." Id.

The trial court then explained that if the corporate structure is dissolved the process would be "paying any bills, and then dividing the assets, and that would go pursuant to the Buy/Sell Agreement." Tr. p. 49. Timothy did not agree with this characterization because if the dissolution was granted, the Agreement would be "null and void." Id. Thus, Timothy believed that Randall had only filed the petition for judicial dissolution to circumvent the Agreement.

At the conclusion of the October 11 hearing, Timothy requested time to brief the issues. Although the court was reluctant, it gave the parties until October 18, 2012, to file post-hearing briefs.

Randall passed away on October 12, 2012. On October 18, 2012, Timothy suggested that Randall's death be placed in the record and offered his obituary as evidence. Timothy then sought to dismiss Randall's petition on the grounds that his death rendered his petition moot. Both parties then briefed the issues.

8

On October 26, 2012, the trial court denied Timothy's motion to dismiss and granted Randall's dissolution petition retroactively to October 11, 2012, the date of the evidentiary hearing. The trial court ordered the parties to wind up the business and liquidate its assets and reserved the right to revisit the issue of appointing a receiver to carry out these duties.

On November 5, 2012, the Estate filed a motion asking the court to set a hearing to appoint a receiver. That hearing was held on December 3, 2012, and the trial court granted the request. On December 14, 2012, the trial court entered an order appointing a receiver. Timothy now appeals.

## DISCUSSION AND DECISION[4]

### I. Mootness

Timothy first argues that "[b]ecause Randall died on October 12, 2012, his petition became moot before the circuit court ordered dissolution." Appellant's Br. p. 10. This argument relies on the Agreement and its continued enforceability.

Buy-sell agreements, also referred to as transfer restrictions, are treated as contracts. F.B.I. Farms, Inc. v. Moore, 798 N.E.2d 440, 445 (Ind. 2003). "Apart from any statutory requirements, restrictions on transfer are to be read, like any other contract, to further the manifest intention of the parties." Id. at 445-46.

---

[4] We received a Motion for an Expedited Appeal from the Appellants, dated May 29, 2013. This Panel was assigned this appeal along with this motion on June 11, 2013, and we have given it top priority. To that extent, we grant the motion. Although this may not have been what the Appellants had intended, we can only expedite appeals and rule on motions as we receive them, and as stated above, we received the appeal and the motion at the same time and began immediately deciding the appeal.

As stated above, under its explicit terms, the Agreement terminated upon dissolution of the corporation. Appellee's App. p. 10. And the effective date of the trial court's order dissolving the corporation was October 11, 2012, the date of the hearing and one day before Randall passed away. Indiana Code section 23-1-47-4 provides that a court may enter a decree dissolving a corporation "and specifying the effective date of the dissolution." Accordingly, Randall's petition did not become moot when the circuit court ordered dissolution.

## II. Judicial Dissolution of the Corporation

Next, Timothy argues that there was insufficient evidence for the trial court to dissolve the corporation pursuant to Indiana Code section 23-1-47-1. Both parties agree that Indiana Trial Rule 52 supplies the appropriate standard of the review. Rule 52 provides that "[o]n appeal of claims tried by the court without a jury . . . the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."

Indiana Code section 23-1-47-1 provides that a corporation may be judicially dissolved in a proceeding by a shareholder if it is established that:

> (A) the directors are deadlocked in the management of the corporate affairs, the shareholders are unable to break the deadlock, and irreparable injury to the corporation is threatened or being suffered, or the business and affairs of the corporation can no longer be conducted to the advantage of the shareholders generally, because of the deadlock; or

10

(B) the shareholders are deadlocked in voting power and have failed, for a period that includes at least two (2) consecutive annual meeting dates, to elect successors to directors whose terms have expired.

In the instant case, McNamee, the Company accountant, testified that for years he had advised Randall and Timothy to dissolve the corporation. Tr. p. 20. McNamee explained that there was no reason to keep the complexity of the corporation when Randall was performing all the labor and services for the Company. Id. at 21-23. However, Timothy was not in favor of dissolving the corporation. Id. at 23. Thus, Randall and Timothy disagreed regarding whether the corporation should be dissolved.

Moreover, McNamee testified that based on his experience as an accountant, the business affairs of the corporation could not be conducted to the advantage of the shareholders and directors with the deadlock that existed between the shareholders. McNamee further explained that it was the assets of the corporation "that generates the revenue to pay medical insurance, and then gas bills, which is, principally, what this company is doing." Tr. p. 28. Furthermore, McNamee stated that only fifty percent of the entity had been working while the other fifty percent had been deducting "items for business purposes that are questionable." Id. In short, the Company was sustaining itself solely with assets. Id. at 29.

Further, even before Randall became terminally ill and was able to perform labor and services for the corporation, the profits were small. And although Timothy contends that he wanted to be active in the business since 2003 or 2004, he was not. But the contentious nature between the brothers is best illustrated by a comment made by

11

Timothy about Randall's terminal illness: "but you've got to get out of bed and go to work." Tr. p. 66. Thus, the brother and shareholder who had chosen for years to not be active in the corporation thought that the corporation would be more profitable if the shareholder who had done everything for the corporation during that time would get out of his death bed and go to work.

In short, the evidence before the trial court established that the corporation was no longer profitable because of Timothy's disability and Randall's terminal illness. Consequently, the business of the corporation could no longer be conducted to the advantage of the shareholders, who were deadlocked as to whether to dissolve the corporation. Accordingly, under these circumstances, we cannot say that the trial court erred when it dissolved the corporation.

Nevertheless Timothy contends that the trial court should not have dissolved the corporation insofar as Randall was simply attempting to circumvent the Agreement. In light of our analysis above, we agree with the Estate's assertion , "when [the Agreement] was executed, both Timothy and Randall were active participants in the business, both contributing their knowledge, skill and labor for the benefit of the corporation." Appellee's Br. p. 26. But at this point, "there [is] no one left to operate the corporation and it could no longer be operated to the benefit of the shareholders." Id. at 27. Therefore, this argument fails.

The judgment of the trial court is affirmed.

MAY, J., and MATHIAS, J., concur.